UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

————————————————

In re:

MUHAMED KADIRIC and MERSIHA
KADIRIC,

             Debtors.

Case No. 24-03325-swd
Hon. Scott W. Dales
Chapter 11 (Subchapter V)

_____/

## MEMORANDUM OF DECISION AND ORDER

PRESENT:    HONORABLE SCOTT W. DALES
                      Chief United States Bankruptcy Judge

### I. INTRODUCTION

At the March 25, 2025 hearing to consider the United States Trustee's Motion for Conversion or Dismissal (ECF No. 55, the "Motion"),[1] spouses Muhamed and Mersiha Kadiric (the "Debtors") told their story of financial success, fraternal discord, business reversals, rebuilding, betrayal, breakdown, and bravado that ultimately brought them to bankruptcy court.

They testified about a brother, an insurance company, business associates, professionals (and at least two persons posing as professionals) who let them down and, they say, contributed to the financial and family distress that cost them millions of dollars, two successful construction companies, their reputations, and relationships. In the days leading up to the bankruptcy filing, the Debtors' response to these remarkable hardships was understandable, even age old, but ultimately disqualifying under the Bankruptcy Code.[2]

---

[1] Creditors Nu Direction Lending, LLC ("Nu Direction") and E-Advance Services, LLC ("E-Advance") concurred in the Motion.

[2] References to "Bankruptcy Code" or to specific statutory sections in the text of this opinion are to 11 U.S.C. §§ 101-1532 unless otherwise indicated. References to "Rule" are to the Federal Rules of Bankruptcy Procedure.

Rather than seeking simply to dispossess them under § 1185(a) for "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor, either before or after the date of commencement of the case" and leave the subchapter V trustee in place, the United States Trustee argues to replace them with a chapter 7 trustee by moving to convert under § 1112(b). When, as here, debtors elect to proceed under subchapter V of title 11, the United States Trustee has both arrows in his quiver.  *See* 11 U.S.C. §§ 103(g) and 1185.

The 15-day statutory deadline for resolving the Motion requires the court to move quickly,[3] permitting it to offer only an abbreviated explanation for today's decision, an explanation certainly not commensurate with the voluminous record upon which the decision rests.[4]

Because the statute defines "cause" non-exhaustively, by introducing examples of "cause" with the term of art "includes,"[5] motions under § 1112(b) frequently rely on statutory and non-statutory "cause" to convert or dismiss.  Here, the United States Trustee asserts both categories.

For statutory cause, the United States Trustee initially cited the examples enumerated in § 1112(b)(4)(A), (B), (E), (F), (H), (J), and (M), but the record supports only finding cause in (b)(4)(A) (diminution of the estate plus doubtful rehabilitation prospects) and (J) (failure to file a plan on time).  For non-statutory cause, the United States Trustee challenges the Debtors' good faith and fitness to serve as fiduciaries, premised largely on the numerous prepetition transfers they effected on the eve of filing, including transfers of funds, their residence, and a Cadillac Escalade in violation (if not defiance) of the Kent County Circuit Court's restraining order issued in proceedings supplemental to judgment.

---

[3] Absent unusual circumstances, the court shall "commence the hearing on a motion under this subsection [b] not later than 30 days after filing of the motion and shall decide the motion not later than 15 days after commencement of such hearing …"  11 U.S.C. § 1112(b)(3).

[4] A thirty-one page opinion hardly seems abbreviated, except when considered in light of the catalogue of deceit the Debtors suffered and documented over the last seven or eight years.

[5] 11 U.S.C. § 102(3) (as used in the Bankruptcy Code, the words "includes" and "including" are not limiting).

For the following reasons, the court finds statutory and non-statutory cause to convert this case to chapter 7, as the United States Trustee and two active judgment creditors request.

## II. FINDINGS OF FACT

### A. Prepetition Events and Background

At the hearing, the parties stipulated to treat the Debtors' Statement of Facts (ECF No. 88, the "Statement of Facts") and the Supplement to Solemn Declaration of Muhamed Kadiric (ECF No. 58, the "Supplement") as testimony. *See also* Fed. R. Civ. P. 43(c) (applicable per Fed. R. Bankr. P. 9017). In addition, the parties stipulated to the admission of the lettered exhibits attached to those documents and two numbered exhibits introduced at the hearing (the two bid documents for construction jobs the Debtors are pursuing locally). The Debtors also gave live testimony under oath. The following summary comes mainly from these filings and the exhibits, as supplemented by the Debtors' testimony in court.

The Debtors, Bosnian emigres, reside in Ada, Michigan, in a residence they purchased as husband and wife in 2019 (the "Residence"). They listed the value of the Residence as $2.195 million on Schedule A/B, subject to a mortgage in favor of Lake Michigan Credit Union ("LMCU") for approximately $1,492,695.14, per Schedule D.[6] On Schedule C, they claim the Residence as exempt in the amount of $657,304.86, under M.C.L. § 600.5451(1)(n) (for property held as tenants by the entireties).

During the hearing and in their filings, they explain that Muhamed Kadiric ("Mr. Kadiric") and his brother, Rudy, formed a construction company called Titan Interiors, LLC ("Titan") in 2010, and evidently operated it successfully, although not without some brotherly tension, for several years. Mersiha Kadiric ("Mrs. Kadiric") performed light office work for Titan, *e.g.*,

---

[6] The court takes judicial notice of the docket in this matter including, among other entries, ECF Nos. 18 (original schedules) and 44 (amendment of some schedules). Fed. R. Evid. 201.

bookkeeping and party planning for holidays and seminars, but was not deeply involved in Titan's construction business.

Titan's business required it to obtain construction bonds from time to time depending on the needs of a particular project, and the bonding company (Philadelphia Insurance Companies, or "Philadelphia") required Titan, its members, and evidently their spouses, to indemnify Philadelphia for any claims successfully asserted against the construction bonds. Accordingly, the Debtors signed a General Indemnity Agreement (Exh. A), which provided for a continuing guaranty in favor of Philadelphia, subject to their right (as indemnitors) to revoke the guaranty with respect to any unissued (future) bonds upon giving thirty days' notice.

Eventually, in 2017, Mr. Kadiric and his brother, Rudy, agreed to discontinue their business relationship, and they arranged for Rudy to purchase Mr. Kadiric's interest in Titan. In connection with the buyout, Mr. Kadiric allegedly notified the McNish Group, Inc. ("McNish"), an insurance agency allegedly involved in the bonding process for Philadelphia, that he and Mrs. Kadiric intended to terminate their obligations under the General Indemnity Agreement. Mr. Kadiric also retained Grand Rapids law firm Mika Meyers, PLC ("Mika Meyers") to negotiate on his behalf for the sale of his interests in Titan to his brother, and he contends Mika Meyers assured him that he and Mrs. Kadiric would be relieved of any obligations to Philadelphia under the General Indemnity Agreement. Evidently during the several months that Mr. Kadiric and his brother were finalizing Mr. Kadiric's exit from Titan, however, and contrary to Mr. Kadiric's understanding, Philadelphia issued a construction bond in connection with Titan's largest project to date -- the "Stryker Project" -- perhaps unaware that Mr. Kadiric was leaving Titan and had attempted to terminate his (and his wife's) obligations as indemnitors. Unfortunately for them, Philadelphia regarded Mr. and Mrs.

Kadiric as obligated under the bond related to the Stryker Project, even though Mr. Kadiric had no role in bidding or performing the underlying contract.

After disassociating himself from Titan, Mr. Kadiric formed Premier I Interiors, LLC ("Premier"), through which he intended to continue in the construction business, serving as a contractor specializing in interior walls and ceilings. From the Debtors' testimony, Premier also became a profitable business, so profitable,[7] in fact, that in 2019 the Debtors purchased their current Residence for nearly $1.1 million, taking title as tenants by the entireties. *See* Supplement (ECF No. 58) at Exh. A.

Meanwhile, under Rudy's management, Titan ran into trouble on the Stryker Project, prompting the general contractor to draw on the bond Philadelphia issued as Titan's surety, and later prompting Philadelphia to sue the Debtors under the General Indemnity Agreement in 2019. Philadelphia's indemnity claim, and eventual multi-million dollar judgment against the Debtors, though now satisfied through settlement, marked the beginning of the end of the Kadirics' former prosperity.

Obviously distressed during the litigation with Philadelphia, Mr. Kadiric turned for advice to his godfather, whose wife introduced him to Kevin Kyle -- an introduction the Debtors would later regret as "one of the most destructive events of Mr. Kadiric's life." *See* Statement of Facts (ECF No. 88) at p. 12. Originally, Mr. Kadiric believed that Mr. Kyle was a licensed attorney who could assist him in selling Premier to raise cash to fund a settlement or otherwise address Philadelphia's indemnification claims. As it turns out, according to the Debtors, Mr. Kyle and the proposed purchaser of Mr. Kadiric's interest in Premier -- Mr. Kosi Stobbs -- were con artists hellbent on embezzling from Premier and Mr. Kadiric.

---

[7] Muhamed stated that Premier had approximately $6 million per year in gross revenue between its formation in 2019 and 2023.

The Philadelphia indemnification litigation dragged on for a few years and in 2023 the Debtors eventually entered into a settlement requiring an initial payment they knew they probably could not make. They soon defaulted in making the payment, and under the terms of the settlement, Philadelphia entered a "pocket judgment" against them in the Oakland County Circuit Court in the amount of $6.2 million. Philadelphia and its lawyers vigorously pursued collection, threatening to liquidate the Debtors' Residence and everything else, according to Mr. Kadiric's emotional testimony at the hearing on the Motion. Eventually, through payment using funds Mr. Kadiric derived from Premier, arguably under the Stock Purchase Agreement ("SPA"),[8] and later using funds from refinancing the Residence, the Debtors paid Philadelphia in full, though discounted, satisfaction on April 3, 2024, using $1.2 million to settle the $6.2 million pocket judgment.

Clearly, the Debtors blame McNish and Mika Meyers for their problems with Philadelphia, claiming that (i) the insurance agency failed to communicate their revocation under the indemnity agreement to Philadelphia in order to maximize its commissions on the Stryker Project bond, and (ii) the law firm committed malpractice and violated its fiduciary duty by not timely terminating their indemnity obligations to Philadelphia before Titan bonded the Stryker Project. The Debtors filed suit against these two entities and that litigation, though in its infancy, remains pending in the Oakland County Circuit Court. The possibility of recovery from McNish and Mika Meyers is a pillar of the reorganization, although, as noted elsewhere, the Debtors have not yet filed a plan.

Desperate to raise cash to pay the Philadelphia judgment, the Debtors, believing Mr. Kyle was an attorney, sought his help in selling Premier. From Mr. Kadiric's testimony, Mr. Kyle was

---

[8] *See* Supplement (ECF No. 58) at Exh. VV. The SPA was the agreement between Mr. Kadiric and Mr. Stobbs, effectively allowing the latter to acquire the former's stake in Premier. The SPA is not a model of clarity and sometimes vacillates between an asset purchase agreement and an agreement for sale of an interest in the company, but the details of this transaction are described below insofar as they bear on today's decision.

an engaging and manipulative person, capable of exciting, calming, and distracting Mr. Kadiric while, as the Debtors tell it, embezzling from Premier.

More specifically, in the summer of 2023, Mr. Kyle introduced Mr. Kadiric to Mr. Stobbs on the pretense that Mr. Stobbs intended to acquire Premier, taking over day-to-day operations (including by assuming Premier's obligations). Messrs. Kyle and Stobbs provided a letter of intent to this effect. Mr. Kyle served as an intermediary as Mr. Stobbs and Mr. Kadiric negotiated the sale of the latter's interest in Premier. In early October 2023, with the Philadelphia judgment still weighing heavily on the Debtors, Messrs. Kadiric and Stobbs entered into a pre-sale "Management Services Agreement" which, as the court infers, put the proverbial foxes in charge of the Debtors' chicken coop. Without belaboring the details, the pre-sale agreement obligated Mr. Stobbs to "take over" Premier's debts and expenses, in exchange for which Mr. Stobbs would "take all rights to the existing [accounts receivable]." Exh. KK. Relying on this agreement, Mr. Kyle persuaded Mr. Kadiric to share his social security number and date of birth and to add Mr. Kyle to Premier's LMCU checking account. According to the Debtors, Mr. Kyle forged Mr. Kadiric's signature on guarantees of loans or merchant cash advances that Mr. Kyle allegedly arranged on Premier's behalf, and he also transferred over $400,000 from Premier's accounts to himself.[9]

Meanwhile, Mr. Kyle continued to work on Mr. Kadiric's behalf (or so Mr. Kadiric thought) towards finalizing the sale of his interest to Mr. Stobbs. Recall that the main purpose of the sale was to raise funds to settle the debt to Philadelphia. On October 30, 2023, Mr. Kadiric and Mr. Stobbs executed the SPA pursuant to which Mr. Kadiric would formally convey his interest in Premier to Mr. Stobbs. The agreement, however, lacked clarity and coherence, and even appears to have mischaracterized Premier as the seller of (variously) stock or assets, although

---

[9] This recitation is not an exhaustive list of harms the Debtors allegedly suffered at the hands of Mr. Kyle.

Mr. Kadiric had intended to sell his membership interest. The court infers that the obvious deficiencies in drafting the SPA resulted from the fact that, despite his misrepresentation, Mr. Kyle was neither licensed nor skilled as an attorney. After signing the SPA, the parties behaved, initially and in many respects, as if Mr. Stobbs had acquired Mr. Kadiric's former membership interest and Premier's assets, especially liquid assets like accounts receivable.

The Debtors summarized the terms of the SPA as follows, which the court repeats only because it tends to explain some of their conduct on the eve of filing, and their belief that they had a right to funds from Premier:

> All of Premier's cash on hand at closing was to be retained by Mr. Kadiric. Mr. Stobbs was to pay Mr. Kadiric $125,000.00 at close. Mr. Stobbs was also to pay Mr. Kadiric $175,000.00 within 30 days after closing. Mr. Stobbs was to pay Mr. Kadiric $9,500.00 every month for 120 months. Mr. Stobbs was to assume Mr. Kadiric's liability on all debts and other obligations of Premier, and also indemnify and hold Mr. Kadiric and Premier harmless for all such obligations. Mr. Stobbs was also required to pay Mr. Kadiric's attorney fees and related costs (up to a total of $175,000.00) in relation to Debtors' lawsuit(s) against McNish and Mika Meyers. Mr. Stobbs also committed to conducting Premier's business in keeping with Premier's best practices and to work to successfully maintain and grow the business. The SPA also excluded Mr. Kadiric's vehicle, a GMC Sierra 1500, and Ms. Kadiric's vehicle, a Cadillac Escalade from the sale, providing that each belonged to Mr. Kadiric.

*See* Statement of Facts (ECF No. 88) at p. 23 and Exh. VV. The Debtors contend that Mr. Stobbs immediately defaulted under the SPA by not making the payments as agreed and not assuming liabilities as agreed. *See* Supplement (ECF No. 58) at ¶ 64. Mr. Stobbs, however, did install a new controller at Premier, and Mr. Kadiric continued working with Premier albeit in a new and reduced role. According to the Debtors, Mr. Stobbs, like Mr. Kyle, misappropriated hundreds of thousands of dollars from Premier, largely by diverting the proceeds of accounts receivable to accounts and entities he controlled. He failed to fund operating expenses, pay suppliers and subcontractors, defaulted on other agreements, and generally failed to pay Premier's debts that he

had purported to assume in the SPA.  Messrs. Stobbs and Kyle ran Premier into the ground, while Mr. Kadiric, still desperate for funds to satisfy the Philadelphia judgment, tried to keep the doomed vessel afloat.

After several months of operations under Mr. Stobbs's direction and in a manner inconsistent with Premier's obligations to its creditors (and Mr. Kadiric), Premier's payroll checks bounced and Mr. Stobbs and his confederates effectively abandoned Premier.  According to Mr. Kadiric's testimony, he tried to work with other employees to carry on Premier's business, make payroll, and pay its debts, but he "ultimately failed." *See* Supplement (ECF No. 58) at ¶ 80.  Before absconding, Messrs. Kyle and Stobbs evidently induced Comerica Bank to establish a $1 million line of credit for Premier, and then drew down the full amount for their own use (or for the use of Mr. Stobbs's other businesses).  In August or September, 2024, having run out of money, Premier ceased operating.

As a result of his unhappy association with Messrs. Kyle and Stobbs, Mr. Kadiric believes he has been unfairly saddled with the obligation to pay many of Premier's commercial and tax debts, even though he believed he was no longer Premier's owner or manager and even though Mr. Stobbs undertook the obligation to pay Premier's debts under the SPA.

To add insult to injury, Mr. Kadiric learned that Mr. Kyle forged his name on various loan documents with E-Advance Services, LLC, and that E-Advance had obtained a default judgment against him personally, and Premier, in the amount of $145,504.40, on June 28, 2024.  Mr. Kadiric's recollection, or at least his report, of when he learned about the E-Advance litigation is vague, but the Statement of Facts (which he adopted under oath during the hearing) reports that "[a]t some point during the summer of 2024, Mr. Kadiric became aware of a lawsuit that was filed

by and a judgment that was entered in favor of E-Advance Services, LLC." *See* Statement of Facts (ECF No. 88) at p. 30.

From the testimony and documents offered during the hearing, the court finds that the financial stresses beginning with the Philadelphia bonding controversy took a toll on Mr. Kadiric's mental health, compromising his business judgment. The regrettable association with Messrs. Kyle and Stobbs, and resulting demise of Premier, exacerbated the distress.

A waterfall of setbacks, cascading from the failure to properly revoke their personal guarantees under the General Indemnity Agreement, cost the Debtors dearly, and tends to explain the various transfers the United States Trustee catalogued at the hearing as indicia of bad faith. *See infra* at p. 21. Indeed, the evidence establishes that during the four months leading up to the petition date (December 20, 2024), the Debtors effected a series of transfers bearing the traditional badges of fraud, as E-Advance and others pursued or threatened post-judgment collection against Premier and Mr. Kadiric.

B. <u>Post-Petition Facts</u>

Several post-petition facts also have a bearing on the Motion. First, with respect to the Debtors' income, Schedule I shows that the Debtors, who currently work for a temporary staffing agency, earn approximately $4,512.50 (net) per month. Schedule J shows living expenses for their five-person household of $4,711.01 -- not including their $10,105.87 monthly mortgage payment, which they say they need not make because they are trying to sell their home and the lender is over-secured. Even without factoring in any ownership or rental expense for housing, the Debtors have a monthly deficit of $198.51, according to Schedule J.

Second, the Debtors described the formation and plans for two new construction entities, which they set up with Mrs. Kadiric as the owner to take advantage of perceived contracting

advantages for "women-owned" businesses. These companies, Grand Rapids Walls and Ceilings, LLC, and West Michigan Demolition and Restoration, LLC, do not yet have a place of business, have not yet acquired bookkeeping software, and do not yet have assets with which to purchase supplies for two local projects of a single, potential customer. In fact, as of the hearing, the Debtors had prepared subcontractor bids (admitted as Exhs. 1 & 2) but had not yet submitted them to the general contractor.

Mrs. Kadiric does not have a builder's license or meaningful construction experience aside from her stint in bookkeeping for a time at Titan and Premier. Her husband, however, assured the court that he would be by her side teaching her the business. For working capital, the business will depend on the sale of the Residence or vendor credit. She admits she has no formal accounting training, but says she is good at math.

Third, the court has authorized the Debtors to retain several legal professionals, including the Oppenhuizen Law Firm, PLLC (their main bankruptcy counsel), Ciano and Goldwasser, LLP (special counsel appointed to pursue claims against McNish and Mika Meyers), and the Law Office of John J. O'Shea, PLC. The Debtors have also filed an application to employ Miller Johnson (as special counsel to assist in setting aside E-Advance's default judgment and defending the Debtors against challenges to their discharge).[10] These lawyers charge hourly rates, according to the various employment applications, of between $250 and $780.

---

[10] For the sake of transparency, the court expresses concern about the estate's retaining counsel to defend the Debtors' discharge, a matter of peculiar importance to the Debtors but seemingly of no value to the estate or their creditors generally. *In re Schlomer*, No. 24-10999-CGB, 2025 WL 553042, at *4 (Bankr. W.D. Tex. Feb. 19, 2025) ("Generally speaking, adversary proceedings seeking to except a particular debt from discharge, while of course very important to *debtors* as well as the affected creditors, do not directly impact the *estate*.").

The Ciano and Goldwasser firm, for example, has agreed to "discounted" hourly rates of between $300 and $600 for counsel, but will bill the estate hourly during "Phase 1" of its representation (pre-suit due diligence period) at a blended hourly rate of $350. The firm will bill at its non-blended hourly rate in Phase II, charging for its time during both phases on a per-hour basis until hitting the hourly cap of $250,000. At that point, the firm becomes entitled to a 40% contingency fee, all subject to court approval. *See* ECF No. 68-2.

The court has also approved the Debtors' retention of Mr. Oppenhuizen at the hourly rate of $325, and he unquestionably has spent many, many hours steering his clients through the early days of the chapter 11 process so far, in and outside of court. It stands to reason that, with the yeoman's work he has already done on this file, and subject to court approval, he will have a substantial administrative claim.

The Debtors have also filed an application to employ an accounting firm, Wesler & Associates, as financial consultants and tax professionals. That firm charges hourly rates for professional accountants ranging from $275 to $325 according to the employment application. The Debtors have retained the firm to prepare 2023 and 2024 tax returns, as well as monthly operating reports, and to assist with the Premier wind-down. From the Debtors' testimony last week, preparing the tax returns and wrapping up Premier's affairs will be no picnic, and if it is a picnic, an unusually expensive one. Given the record-keeping shortcomings at Premier and, according to the Debtors, rampant fraud the alleged fraudsters likely took pains to hide, the court anticipates substantial administrative expenses related to accounting.

For his part, the subchapter V trustee, Thomas Richardson, Esq., although not retained, will most likely seek payment of his fee as a cost of administration. Suffice it to say, this case promises to generate substantial administrative expenses.

Several additional post-petition developments bear on the Motion. Because the Debtors have elected to proceed under subchapter V of chapter 11, the statute required them to file a proposed plan of reorganization within 90 days after the December 20, 2024 petition date. 11 U.S.C. § 1189(b) ("The debtor shall file a plan not later than 90 days after the order for relief under this chapter, except that the court may extend the period if the need for the extension is attributable to circumstances for which the debtor should not justly be held accountable"). On the ninetieth day, March 20, 2025, rather than filing a plan, the Debtors filed a motion to enlarge the deadline for doing so. ECF No. 97. They seek a 90-day extension to file a plan.

## III. CONCLUSIONS OF LAW

A. <u>Section 1112(b)</u>

In general, § 1112(b), which applies in subchapter V cases, requires the court to convert or dismiss a case, or take other measures depending on the interests of creditors or the estate, upon a finding of "cause." 11 U.S.C. § 1112(b)(1). Congress directed the court to move quickly in resolving a motion under § 1112 by conducting the hearing and rendering the decision with dispatch. *Id.* § 1112(b)(2).

Congress also enumerated specific examples of cause for conversion or dismissal but prefaced the enumeration using the word -- "includes" -- to signal that the statutory list is not exhaustive. 11 U.S.C. § 1112(b)(4) (examples of "cause"); *Id*. § 102(3) ("includes" is "not limiting"); *Michigan Nat'l Bank v. Charfoos (In re Charfoos)*, 979 F.2d 390, 392 (6th Cir. 1992) (bad faith may serve as a ground for dismissal, even though it is not expressly stated under § 1112(b)); H.Rep. 595, 95th Cong., 1st Sess. 406 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6631–32. ("The list is not exhaustive. The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases"). Therefore, an

entity seeking to convert or dismiss a case may succeed by establishing either statutory or non-statutory reasons warranting relief, meeting the usual preponderance of the evidence standard. *In re Exigent Landscaping, LLC*, 656 B.R. 757, 764 (Bankr. E.D. Mich. 2024).

Here, the United States Trustee's presentation suggests two statutory grounds for conversion: (1) "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation"; and (ii) failure to timely file a plan. *See* 11 U.S.C. § 1112(b)(4)(A) and (J).

Upon finding "cause," the statute provides that the court "shall" convert or dismiss (or take other steps outlined in the section), unless it makes specific findings:

> (2) The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that—
>
> (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and
>
> (B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—
>
> (i) for which there exists a reasonable justification for the act or omission; and
> (ii) that will be cured within a reasonable period of time fixed by the court.

*Id.* § 1112(b)(2).

With this framework in mind, the court now turns to the main questions the Motion has raised.

B. <u>Statutory Cause</u>

      1.     *Continuing Loss to the Estate*

The United States Trustee argues that the Debtors are not bringing in enough income or other property to carry the costs of administration. He worries that substantial professional fees have already accrued, and will continue to accrue, resulting in continuing loss to the estate. *Loop Corp. v. United States Trustee*, 379 F.3d 511, 516 (8th Cir. 2004) (negative cash flow resulting from administrative expenses may satisfy the first element of § 1112(b)(4)(A)).

As noted above, the Debtors have retained, or proposed to retain, four law firms and an accounting firm, and these professionals will have plenty of work to do in prosecuting causes of action and preparing Premier's and the Debtors' tax returns, according to the Debtors' own arguments in connection with the Motion. To shoulder the expenses, the Debtors currently have negative monthly net income according to their schedules -- even without considering their substantial monthly housing payment to their home lender. *See supra* at p. 10. They also have approximately $30,000.00 in a refunded retainer from one of their professionals, and the hope of recovery against McNish, Mika Meyers, and Messrs. Kyle and Stobbs. They also contend that they may devote funds from the sale of their Residence, notwithstanding their current exemption claim.[11]

At the hearing, Mr. Kadiric testified that he was scheduled to interview for a construction related job on the next day, which would pay approximately $55 per hour (to be negotiated). The prospective employment is for forty hours each week (or gross wages of $2,200 per week), an

---

[11] In Schedule J, the Debtors state: "Debtors have listed their home for sale. Debtors claim an entireties exemption in their home and will use the net proceeds for living expenses, may use the net proceeds for administrative expenses of the estate, and to fund the new businesses formed in November 2024 in order to begin generating income. Debtors do not anticipate making payments on their mortgage while the home is listed; LMCU is significantly over-secured and does not require adequate protection pmts."

anticipated improvement over his current hourly rate.  As of the hearing, however, Mr. Kadiric had not yet interviewed for the position, so the job opportunity is, for now, just that -- an opportunity.  Moreover, the court infers that, even assuming Mr. Kadiric interviews and is hired to perform labor at $55 per hour, he will not be able to work for that employer while training Ms. Kadiric in running the two new "woman-owned" entities described above, while actually doing the construction work on whatever contracts the new entities happen to land.  Moreover, after materials (which the testimony shows they are not currently able to purchase except on vendor credit), the anticipated gross profit from these yet-to-be bid projects for Lovett Pet Health Center (Exh. 1 and 2) is approximately $51,000.00.

The United States Trustee could have connected the dots more closely, for example by favoring the court with estimates of the "burn rate" for the various professional fees, but it is fair to infer, as the court does based on its experience and a "back of the envelope" calculation,[12] that the monthly costs of the professionals will obviously outstrip the Debtors' current (and modest) disposable income.  The court would not be surprised if McNish and Mika Meyers intend to fight against the Debtors' claims tooth and nail -- McNish sent counsel to the conversion hearing although it does not appear to have claims against the Debtors, and Mika Meyers has an obvious reputational and financial interest to defend, and a stable of lawyers (in-house and out) to do just that.  Recovery from these sophisticated, motivated, and counseled actors will not be a cakewalk, but instead a very expensive dance.

Regarding the $30,000 retainer that Ciano and Goldwasser recently returned to the Debtors, the court will assume that the refund will be available for administrative claims (although Premier's

---

[12] If the court assumes that each of the five professional firms spends only 5 hours per week on the estate's issues, at approximately $300 per hour, the burn rate would be approximately $6,525 per month (assuming 4.35 weeks each month).  It seems likely that Mr. Oppenhuizen and the litigation firms will spend far more than that on the bankruptcy case and the tort and contract litigation every month, well into the case. This calculation is quite conservative.

creditors likely regard it as part of a potentially avoidable transfer of the Cadillac Escalade from Premier in violation of the state court's order).  Because the Debtors and Ciano initially believed it would be used to pay a single firm (and then, likely only a fraction of that firm's fees), the court infers that the refunded retainer will not satisfy all administrative claims.

Other sources to pay administrative claims (and avoid the administrative insolvency that has, in part, motivated the United States Trustee to file the Motion) include the Debtors' prepetition tort claims related to Premier.  The Debtors have gone to great lengths to showcase evidence of their claims against Messrs. Kyle and Stobbs, but almost nothing suggesting the collectability of these proposed defendants.  Moreover, the record tends to show that, apart from the breach of contract claims under the SPA, much of the misconduct -- embezzlement from Premier -- harmed Premier directly, rather than Mr. Kadiric.  Even assuming that Mr. Kadiric can win a judgment for wrongs the malefactors inflicted on him directly, Mr. Kadiric's testimony suggests that both potential defendants have absconded, and one is based in Canada.  These facts do not favor collection even assuming Mr. Kadiric (and Premier) quickly and inexpensively win a default judgment against the alleged con artists.

Regarding the other defendants (McNish and Mika Meyers), the court assumes their pockets are much deeper and easier to locate, and that these more sophisticated players have assets and insurance to pay claims.  Even assuming all this is true, however, the court is not in a position to evaluate the Debtors' likelihood of success on the merits.  The court is not willing to speculate on the value of these claims or the timing of liberating that value to satisfy administrative claimants without a better record showing the strength of the claims and potential defenses -- the sort of record that a settlement under Rule 9019 would provide.

As for their Residence, the schedules (and last year's appraisal included as an exhibit), coupled with the LMCU closing statement from the refinancing, show substantial equity which the Debtors said in a footnote to Schedule J that they "may" devote to administrative expenses. On the other hand, the Debtors have claimed much of the value of the Residence as exempt. Their statements during the hearing about using the allegedly exempt proceeds from the sale of their Residence to pay administrative expenses were more committal but given the strong policy against using exempt property to pay for administrative expenses, and the absence of a proposed plan dedicating exempt property to creditors, the court (and creditors) cannot necessarily assume the Debtors' proposal is ironclad. 11 U.S.C. § 522(k); *Law v. Siegel*, 571 U.S. 415 (2014); *In re Holley*, 661 F. App'x 391, 394 (6th Cir. 2016) (citing *Law v. Siegel* and finding (after trustee filed final report) that trustee could not use sale proceeds of tenancy by the entireties property even where the debtors stipulated to an order granting the trustee's motion to sell, conditioned on the Debtors' having the opportunity to seek their own purchaser, and the trustee retained the sale proceeds).

As for a reasonable prospect for "rehabilitation," it is not entirely clear what that term means as applied to debtors who are natural persons, as opposed to operating artificial entities. Caselaw teaches that rehabilitation and reorganization are not equivalent, although the concepts are related.[13] Rehabilitation "signifies something more, with it being described as 'to put back in good condition; reestablish on a firm, sound basis.'" *Exigent Landscaping*, 656 B.R. at 765-66 (citations omitted). The Debtors' stated reason for filing this case under subchapter V was the need

---

[13] The United States Trustee's forecast of unpaid administrative expenses raises considerable doubt about the prospects for *reorganization*, given that a debtor must pay current administrative claims in full at confirmation, as a condition of confirmation, absent agreement from the administrative claimants to the contrary. 11 U.S.C. §§ 1129(a)(9) and 1191. Although many attorneys for subchapter V debtors agree to postpone payment to grease the skids for confirmation, the record is silent in this respect, and the court will not assume that all counsel and accountants will waive the protection of § 1129(a)(9). The fact that the reorganization depends on the prosecution and collection of tort claims does not, alone, doom reorganization, but the likely delays in getting to confirmation do not bode well for a timely *rehabilitation*.

to wind-down the business of Premier because Mr. Stobbs had looted and abandoned the company. Certainly, there is no prospect for rehabilitating Premier, and the Debtors have not suggested otherwise. As for the Debtors, they are not really proposing a reorganization as much as a liquidation that they intend to manage, through sale of their home and prosecution of claims against McNish and Mika Myers. In a sense, the Debtors' supposed "rehabilitation" -- the much-hoped-for restoration of the losses they sustained allegedly at the hands of McNish, Mika Meyers, Stobbs, and Kyle, depends on pending (and not yet filed) litigation -- litigation likely to last many years. Given the tight deadlines that apply in subchapter V cases, litigation-based rehabilitation is not likely to occur within a reasonable amount of time. *In re California Palms Addiction Recovery Campus, Inc.*, 87 F.4th 734, 741 (6th Cir. 2023).

The court acknowledges the Debtors' recent creation of Grand Rapids Walls and Ceilings, LLC and West Michigan Demolition and Restoration, LLC, just before filing, which undercuts the characterization of this proceeding as purely a liquidation case. Nevertheless, the United States Trustee established through questioning that the new businesses have no location, no contracts, no business accounting software, no employees (other than perhaps the Debtors), and no funds with which to purchase materials to perform the two jobs for their single customer, a customer who has yet to receive the new entities' bids. The testimony established that Mrs. Kadiric, who technically owns the businesses to make them more attractive to customers seeking to deal with a woman-owned enterprise, has no meaningful construction experience. Her experience with her husband's former companies was limited to bookkeeping and entertaining.

While Mr. Kadiric has a proven track record of building successful construction businesses, he also has a record of losing them. His missteps during the breakup with his brother and Titan, and poor judgment at Premier starting in late 2023, precipitated the current bankruptcy. Of course,

prepetition business failures are the stuff of chapter 11, so the fact of the failures (standing alone) is not disqualifying.  Rather, the lapses in judgment leading up to the reversals, and the emotional toll they took on Mr. Kadiric, coupled with Mrs. Kadiric's inexperience in the construction business, make the prospects for success of Mrs. Kadiric's two new entities rather speculative.

Having carefully considered the evidence adduced at trial, the court concludes that the continued prosecution of this case under the Debtors' management promises the sort of "continuing loss" that § 1112(b)(4)(A) enumerates as "cause" to convert or dismiss, and the United States Trustee has established the absence of reasonable prospects for rehabilitation.  *California Palms*, 87 F.4th at 741.  Together with the continuing loss described above, the United States Trustee has established cause under § 1112(b)(2)(A).

As the United States Trustee and the Debtors both agree, subchapter V cases are supposed to move quickly towards confirmation, but this case has not and will not achieve that goal.  Without putting too fine a point on the court's view of this, the many substantial and questionable transfers that the Debtors effected in the months and even days leading up to the petition date understandably complicated the prosecution of their case, resulting in protracted document production and several adjournments of the creditors' meeting under § 341.  The creditors' obvious and justifiable lack of trust in these Debtors also promises further delay.  The court lays the cause for the delay at the Debtors' feet, making reliance on § 1112(b)(2)(B) untenable.

### 2. *Failure to Timely File a Plan*

The record establishes that the Debtors did not file a proposed plan within 90 days of the order for relief as the statute requires, only a motion to enlarge that period for another 90 days. More precisely, the statute provides in relevant part that, for purposes of § 1112(b), "cause"

includes the "failure … to file … a plan, within the time fixed by this title or by order of the court." 11 U.S.C. § 1112(b)(4)(J).

The March 20, 2025 deadline that § 1189 prescribes is the only deadline the court will consider, because it has yet to issue any order fixing the time to file the plan.[14]  The court finds enumerated "cause" under § 1112(b)(4)(J).

### C. Non-Statutory Cause: Bad Faith and Unfitness as Fiduciaries

The United States Trustee, with strong echoes from E-Advance and Nu Directions, contends that various transfers the Debtors made leading up to this bankruptcy, allegedly designed to thwart the creditors, demonstrate bad faith and disqualify them as fiduciaries under chapter 11.

The court puts the highlighted transfers in three categories: (1) the transfers of the Residence into and out of the Debtors' trust in late September 2024; (2) Mrs. Kadiric's transfers of $102,000 to repay debts to friends and family within weeks of filing the petition; and (3) the gratuitous transfers of the Cadillac Escalade from Premier to Mr. Kadiric and then to Mrs. Kadiric, which preceded Mrs. Kadiric's sale of the vehicle to Harvey Cadillac on November 20, 2024 -- immediately following Mr. Kadiric's examination in proceedings supplemental to the E-Advance default judgment.

First, the Residence.  The evidence established that on September 30, 2024, the Debtors quitclaimed their Residence to Mrs. Kadiric as trustee of the "HLD Family Trust" (the "Trust"), a

---

[14] As a practical matter, by filing their 90-day extension motion on the original deadline to file the plan -- a mere five days before the hearing on the United States Trustee's request to convert -- the Debtors precluded the court from "fixing" a new deadline.  Moreover, the filing of a motion to enlarge a deadline is not equivalent to extending that deadline. *Contra* 7 Collier on Bankruptcy (16th ed.) ¶ 1112.04 (suggesting that the court could enlarge the deadline for filing a plan under § 1189(b), upon proper showing under that more flexible statute and without meeting the more stringent exceptional circumstances test under § 1112(b)(2), even after an interested party files a motion to dismiss or convert). After an interested party has colorably invoked the protection of § 1112(b)(1), and as a matter of statutory construction, the court believes that it should be guided by § 1112(b)(2) in evaluating the cure of any omission identified in § 1112(b)(4), such as the failure to file a plan on time, rather than the similar though less demanding standard under § 1189(b).

revocable trust the Debtors established that same day. From the testimony, the court finds that the Debtors transferred only their Residence into the Trust, not their personal property, and from the "Certified Extract of HLD Family Trust," it appears that they were the settlors of the Trust, and Mrs. Kadiric was both the sole trustee and sole beneficiary. Under the Trust, Mrs. Kadiric evidently had authority, acting alone, to sell, mortgage, convey etc. the Trust's property, i.e., the Residence. On December 20, 2024 -- the petition date -- and on the advice of their current counsel, Mrs. Kadiric as trustee reconveyed the Residence from the Trust to the Debtors. They stipulated that at the time they transferred the Residence into the Trust, there were at least two outstanding judgments (E-Advance and Nu Directions) and several lawsuits. They also stipulated that they reconveyed the Residence to themselves as husband and wife just before filing bankruptcy in order to fortify their tenancy by the entireties exemption.

Mr. Kadiric testified that he and his wife transferred the Residence into the Trust to provide for their children in case he and his wife should die, but the court does not credit this testimony given (1) the timing of the transfer, and (2) the fact that Mrs. Kadiric was named as the sole beneficiary, not any of the children. Naming Mrs. Kadiric as sole beneficiary would be of no use to the children, indeed it would likely saddle them with litigation in probate court, should the Debtors perish. The creation and funding of the Trust exhibited many of the classic badges of fraud -- gratuitous transfer of primary asset, control retained in transferor, pending judgments and lawsuits -- although this transaction probably did not harm the Debtors' creditors, as noted below.

The re-transfer from the Trust to the Debtors for the stipulated purpose of creating or at least fortifying an exemption for property held as tenants by the entireties -- liable only for claims of joint creditors -- however, is more problematic. *See, e.g., Moyer v. Rosich (In re Rosich)*, 570 B.R. 278, 283 (Bankr. W.D. Mich. 2017) (citing *Newlove v. Callaghan*, 86 Mich. 297, 48 N.W.

1096 (1891), for the proposition that "estates in entirety cannot be created at the expense of creditors and held in fraud of the latter's right").

The court is not, under the guise of this expedited conversion motion, avoiding any transfer or re-transfer. Indeed, it seems likely that the transfer into the Trust did not harm creditors given that entireties property is generally not an "asset" under the Michigan Uniform Voidable Transactions Act, M.C.L. § 566.31(b)(3) (defining "asset" to exclude entireties property), and property of a revocable trust generally remains liable for claims against the settlor during settlor's lifetime. *Id.* § 700.7506(1)(a) (Michigan Trust Code regarding revocable trusts). Nevertheless, transfers have consequences,[15] so assuming the September 30, 2024 transaction involving the Residence qualifies as a transfer, the court may, in a proper context, regard the transfer from the Trust back to the Debtors as an improper augmentation of entireties property.

For now, the court simply notes that the transaction cries out for the scrutiny of an independent trustee rather than the Debtors in possession who effected the transfers and who remain very interested in the Residence, even granting that creditors also have standing to challenge exemption claims. Fed. R. Bankr. P. 4003(b)(1).

The second set of challenged transfers involves the Debtors' withdrawal of $170,000 in cash from the couples' joint LMCU account in late 2024 to pay "living expenses" ($68,000) and $6,000 each to seventeen family members and friends within the Debtors' Bosnian community (for a total of $102,000).[16] The amount of the transfers ($6,000 to each transferee) did not vary with the amount of the supposed debts.

---

[15] *Lasich v. Wickstrom (In re Wickstrom)*, 113 B.R. 339 (Bankr. W.D. Mich. 1990) (rejecting "no harm, no foul" argument in similar context).

[16] During the hearing, Mr. Kadiric equivocated on whether he was involved in making the transfers, initially stating that he and his wife both made the transfers. When the court perceived that the United States Trustee's counsel misheard his answer (and re-posed the question), Mr. Kadiric stated that "[m]y wife made the payments." His answer reinforced counsel's misperception and prompted her to reserve this area of questioning for Mrs. Kadiric, freeing him from answering further questions about the questionable transactions.

Mrs. Kadiric explained that the cash came, ultimately, from Premier's coffers, presumably money that Mr. Stobbs should have paid (or suffered to be paid) under the SPA.  She stated that starting in 2023 and continuing into 2024, members of their community supported the Debtors with small, informal (and undocumented) cash loans as they struggled to make ends meet during their tribulations with Philadelphia, Messrs. Kyle and Stobbs, and others, and as her mother underwent several eye surgeries in Bosnia.  In a flash of candor during the hearing, Mrs. Kadiric admitted that she made the various $6,000 payments in part because the Debtors live in a small community and needed to "keep the reputation going" and in part to keep the funds away from other creditors.  Further investigation of these transfers may also reveal badges of fraud, and potentially preference exposure for the transferees, notwithstanding the United States Trustee's insinuation that the Debtors made the $6,000 transfers to shield their family members and friends from preference exposure.[17]

More specifically, during the hearing, counsel for the United States Trustee suggested that making transfers under the threshold for avoidance in a business case was "convenient," and inquired (without objection) whether the Debtors had consulted counsel in structuring the payments.  She said she had not consulted counsel, and in November 2024 (at the time she was making the transfers) she was not thinking of bankruptcy, "not in a million years."

For his part, through the Statement of Facts, Mr. Kadiric averred that he had not considered bankruptcy before he engaged James Buster, Esq., of Miller Johnson, to seek relief from the E-Advance judgment.  This statement, likely intended to blunt the United States Trustee's criticism of the timing and amount of these and other transfers in late 2024, is less than plausible not just

---

[17] The shield of § 547(c)(9) may not apply to these transfers given the testimony that most of the debts at issue were Mrs. Kadiric's, and the schedules suggesting that much of her debt is attributable to her use of consumer credit cards. *See* 11 U.S.C. § 547(c)(9) (applicable "in a case filed by a debtor whose debts are not primarily consumer debts").

because bankruptcy is a natural consideration for sophisticated businesspeople facing a mountain of debt, such as the Debtors, and not just because Mrs. Kadiric had previously resorted to bankruptcy in this very court in 2013. Rather, the court is dubious because the Debtors' former counsel, Brion Doyle, Esq., of Varnum LLP, through a March 14, 2024 email, advised Philadelphia's counsel that "the Kadirics have retained Mike Hanrahan, a bankruptcy practitioner in Grand Rapids," and that "[i]f we cannot get a deal done for the $1.2 million, the Kadirics will be forced to file." *See* Statement of Facts (ECF No. 88) at p. 38 and Exh. ZZ.

Although it may be true that they did not consult their current bankruptcy counsel until November 15, 2024 (Statement of Facts at pp. 31-32), the court finds that the Debtors had been considering bankruptcy since at least March 14, 2024. Therefore, the court discredits Mrs. Kadiric's testimony that she was not thinking of bankruptcy when she was making the various $6,000 transfers below the threshold of preference avoidance for debtors with business debts. The statement is too cute by half.

The court reiterates that it is not avoiding these transfers today, but only explaining that, like the transfer of the Residence, creditors would be better-served by having a disinterested professional (rather than a friendly or related debtor-in-possession) scrutinize the transactions. Given the Debtors' relationships with the transferees and the importance Mrs. Kadiric attached to preserving her reputation with the local Bosnian community, the court concludes that the Debtors are not suited to the task of investigating (or perhaps avoiding and recovering) the seeming preferences. The admitted $6,000 transfers, in the aggregate, are too substantial to overlook, even without considering how the Debtors may have spent $68,000 on living expenses in the run-up to bankruptcy, representing the balance of the $170,000 cash withdrawal from their LMCU account.

The final transfer, or series of transfers, that the United States Trustee highlights as evidence of bad faith, relates to the Cadillac Escalade that Premier owned (and paid for), but that Mrs. Kadiric used to drive.[18]  She explained, by reference to the SPA at § 3.1.1, as her husband did earlier, that Mr. Stobbs agreed to exclude the Cadillac from the sale as one of the vehicles that Mr. Kadiric would retain after closing.  She acknowledged, however, that Premier was, until shortly before the petition date, still listed as owner on the vehicle title and had been making payments on the car loan.  It stands to reason that Premier's creditors, including judgment creditors E-Advance and Nu Directions, likely expected that assets in Premier's name and on Premier's books would be available to satisfy Premier's indebtedness.

Although neither the United States Trustee nor E-Advance favored the court with a copy of the Kent County Circuit Court's order restraining Premier and Mr. Kadiric from transferring property available for execution (presumably part of the post-judgment creditors' examination subpoena), Mr. Kadiric admittedly participated in the creditors' examination with the assistance of counsel, and had to have known about the state court's injunction. In the court's experience, a restraining order is a usual part of the form subpoena issued in proceedings supplemental.  There is no dispute that he testified about the Cadillac at the November 20, 2024 examination and no dispute that after leaving the examination, he and his wife together drove the vehicle to Harvey Cadillac where, after transferring it from Premier to Mr. Kadiric then to Mrs. Kadiric, Mrs. Kadiric sold it to the dealership for approximately $62,000.00.  Mrs. Kadiric testified that she used the money to pay three law firms, each of which the court has appointed under § 327(a).[19]  The court

---

[18] If further evidence supporting the challenge to the Debtors' fitness as fiduciaries were necessary, the court would point to Mrs. Kadiric's steadfast refusal to concede that the Cadillac Escalade belonged to Premier, because she drove it.  At least six times during her testimony, she adamantly insisted the car was "mine" and seemed indignant about having to answer questions about *her* vehicle.

[19] Ciano and Goldwasser evidently refunded $30,000 post-petition as reported in a supplement to the firm's employment application.

finds that Mr. Kadiric was aware of the restraining order and flouted it. Although he had an expectation under the SPA that the Cadillac Escalade was "excluded" from the sale (*see* SPA at § 3.1.1 and Exh. B thereto), it apparently remained titled in Premier's name until shortly before Mrs. Kadiric, who is not obligated to E-Advance or Nu Directions, took title and sold it. The creditors, understandably, cannot brook this attitude in a fiduciary, and neither will the court.

In a similar vein, though not among the United States Trustee's highlighted transfers, Mr. Kadiric testified that in October 2023, he transferred $500,000 from Premier's LMCU account to an entity called Commercial Interiors as a return of his earlier investment in Premier. He admitted that Commercial Interiors was his cousin's non-operating shell company, an entity not entitled to the funds except by Mr. Kadiric's fiat. Even assuming Mr. Kadiric was entitled to these funds under the SPA or otherwise, the means of the transfer -- from Premier's account to a family member's shell company -- understandably raises an eyebrow or two.

Mr. Kadiric testified that Premier was paying its debts at the time, evidently to rebut criticism that the half a million dollar transfer was a fraudulent transfer (as to Premier's creditors). With respect to his own creditors, however, he admitted that (on Mr. Kyle's advice) he transferred the money into his cousin's entity's account to protect it from Philadelphia and preserve his ability to use the funds as a voluntary, partial payment toward the settlement of the insurance company's $6.2 million pocket judgment. This appears to be the first in the pattern of deceptive transfers the court regards as disqualifying the Debtors from serving as the fiduciaries of their bankruptcy estate.

Within weeks of selling the Cadillac, and on the day that the Kent County Circuit Court had originally scheduled a contempt hearing targeting Mr. Kadiric, a hearing on Mr. Kadiric's motion for relief from E-Advance's default judgment, and an examination of Mrs. Kadiric, the Debtors filed their voluntary petition under chapter 11. Many debtors time their bankruptcy

petitions based on state court enforcement proceedings, and for whatever it is worth, the Debtors filed their petition hours after the Hon. Terrence Acker advised the parties that, for his own personal reasons, he was adjourning the hearings.

To summarize, the United States Trustee has established "cause" under § 1112(b)(1) based on the various transfers and the need for a robust investigation by a disinterested fiduciary.

D. No Exceptional Circumstances Under § 1112(b)(2)

As noted above, even if a court finds cause to convert or dismiss under § 1112(b), that section provides a safety valve, providing that the court cannot dismiss or convert in the face of specifically identified "unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate," and a reasonable likelihood that a plan will be confirmed within a reasonable amount of time under the circumstances. 11 U.S.C. § 1112(b)(2). The concurrence of E-Advance and Nu Direction in the United States Trustee's Motion suggests their view, entitled to some deference, that conversion serves their best interests. And, for the reasons set forth above with respect to the allegations of the Debtors' bad faith, their prepetition transfers also point decidedly towards conversion, rather than denial of the Motion or dismissal.

During the hearing, the Debtors' counsel expressed concern that a chapter 7 panel trustee would not pursue the claims against McNish and Mika Meyers or others as vigorously as the Debtors would, and that his clients would likely forfeit their hoped-for surplus if the court made the trustee the estate's representative. The concern is not farfetched but is one the Debtors and the court can address under Rule 9019 if and when that time comes. The Debtors also presumably have similar concerns about who controls the liquidation of the Residence. Again, a reasonable prospect of a surplus and exemption claims may give chapter 7 debtors standing to be heard on such issues. The Debtors can sufficiently protect their interests.

Against these concerns the court must respect the dictate of the statute, which elevates the interests of the creditors and the estate over the Debtors' direct interests. 11 U.S.C. § 1112(b)(2). The creditors and the estate deserve a disinterested, dispassionate fiduciary[20] to evaluate not only the causes of action against McNish and others, but also the transactions involving the Residence, the Cadillac Escalade, and the Debtors' community supporters.

## IV. CONCLUSION AND ORDER

Having heard the testimony of these Debtors the court concludes that they have suffered greatly, starting in 2017, but also that they are not equipped to continue serving as the estate's fiduciaries. This is not a close question. And, as between conversion and dismissal, conversion (which the active creditors support) rather than dismissal, will better serve the interests of creditors and the estate.

The record unquestionably shows that the Debtors suffered business reversals and incurred debts including (fairly or not) debts represented by court judgments. Unfortunately, they responded to collection efforts in a manner that Anglo-American law has condemned for centuries. *See, e.g.,* Statute of Elizabeth, 13 Eliz. 1, c. 5 (1571) (early fraudulent conveyance statute). Their response, understandable but unwise, disqualifies them from continuing to serve as fiduciaries and, together with the imminent secondary insolvency and failure to file a subchapter V plan by the deadline, constitutes cause to convert their case to chapter 7.

Finally, and most generally, the expedited proceeding for small businesses that Congress envisioned when enacting subchapter V of chapter 11 does not lend itself to addressing the Debtors' and their creditors' current circumstances.

---

[20] During the hearing, when recounting his claims against McNish, especially in response to questions from E-Advance's counsel, Mr. Kadiric seemed far from disinterested and dispassionate, as one would expect from a person who blames another for such a dramatic reversal of fortune.

For the foregoing reasons the court will grant the United States Trustee's Motion.

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1. The Motion is GRANTED, this chapter 11 case is converted to a case under chapter 7, and the Clerk shall take the usual steps occasioned by the court's decision to convert.

2. The Debtors shall:

   a. forthwith turn over to the chapter 7 trustee, when appointed, all records and property of the estate under their custody and control, as required by Rule 1019(d);

   b. within thirty (30) days after entry of this Memorandum of Decision and Order, file an accounting of all receipts and distributions made, together with a schedule of all unpaid debts incurred after the commencement of the chapter 11 case, as required by Rule 1019(e)(1); and

   c. endeavor in good faith to file all tax returns required by any order of this court within thirty (30) days after entry of this Memorandum of Decision and Order.

3. The Debtors shall file an amended matrix listing all parties entitled to notice and shall file the statements and schedules required by Rule 1019(a)(1) and 1007(b) within fourteen (14) days after entry of this Memorandum of Decision and Order.

4. Creditors who have filed proofs of claim in this case need not re-file them. *See* Notice of § 341 meeting for the deadline for filing claims.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Memorandum of Decision and Order pursuant to Rule 9022 and LBR 5005-4 upon the Debtors, James R. Oppenhuizen, Esq., Elizabeth K. Patrick, Esq., Thomas C. Richardson, Esq., David A. Lerner, Esq., Scott Mancinelli, Esq., and all persons requesting notice of this proceeding.


END OF ORDER


**IT IS SO ORDERED.**

**Dated April 4, 2025**



Scott W. Dales
United States Bankruptcy Judge